Good afternoon, Your Honors. David Rice on behalf of Appellant Golden Channels and Company. Your Honors, this case, as you know, arises from a license agreement between Warner Bros. and Golden Channels for broadcast cable TV programming in Israel. Following an attempt to renegotiate that agreement, the effort failed and Warner terminated the agreement and sued my client. The district court found that even though Golden had offered to pay everything due under the notice of termination, that it was nonetheless in breach of the contract because it insisted upon return of its letter of credit for the sums due. Now, the case raises two issues on appeal. I'd really like to focus on one of them, obviously, if the court has questions on either. But the first is, was there a breach of contract? Counsel, help me with this. It looked to me as though what it came down to was that Golden something was behind on paying for its programming, but it had a $5 million letter of credit. After the initial term of the contract expired and they were operating on extensions, basically Golden said, we won't pay unless you give back the letter of credit. And Warner refused to give back the letter of credit. It looked to me as though if you use the modified or substantially eliminated parole evidence rule that California has, you could just go either way on the facts that word only isn't the end of the story in California law. And once you can go either way, jury questioned and the jury answered it. What am I missing? Your Honor, I think that part of what we're saying is you can't necessarily go either way on the language of paragraph 13.7. The word only is real strong for you. But isn't it true that in California you can take other circumstances into account? Well, whether or not you take other circumstances into account, that is, whether those other circumstances can be used to vary the terms of the language of the contract is actually a question of law. I thought in California the answer was you can. Under California law, if the court determines that the language is subject, being offered with the parole evidence as one of the possible meanings, there being more than one possible meaning, then that question goes to the trier of fact, which in this case was the district court. But it's a question of law whether, in fact, the language is susceptible of the meaning being preferred with the extrinsic evidence. That's the California parole evidence rule. Why wouldn't it be sufficiently ambiguous here because of the language about negotiating security if there were extensions? Well, what's not ambiguous is the statement simply that because the letter of credit remains only in place until May 31st, so all the contract provides after that is that the parties need to discuss the issue further. Let me tell you what's really on my mind here. It's not just a mechanical question about words. It's a question about the sense of a contract. I just can't see why you would extend credit without security to somebody whose past payment record was a little shaky. It's like telling a client that he has to refresh his retainer every month and keep it up to the proper level in order to keep you working on his case. I mean, why wouldn't you do that? Well, first of all, Your Honor, we're talking about a contract that was created and entered into long before there was any issue of Golden Channels having any problem with its credit. But by the time the renewals came up, Golden Channels had fallen behind. Anyway, it's kind of nice when you're extending that much credit to have security. No, I understand. We can understand the reason why Warner would have wanted security, and there's no question. I just can't see why they would do business without it or why Golden Channels would contemplate that after five years Warner would do business without security. Because that's what they agreed to. At least they agreed to that possibility when they entered into this contract back in 1999. If the contract had said after five years you have to give back the letter of credit and there will be no further security, I would agree with you. But it doesn't. It sort of doesn't say one way or the other. Well, what it says is there won't be a security requirement unless the parties agree to a new security requirement is what this language says. And in fact, although the parties talked about letter of credit during their renegotiations, Golden's understanding of that entire series of conversations, and they're all in the district court's findings of fact, was reasonably that they were talking about some new arrangement they were going to make under an amended agreement. Not the arrangement that they had under the original license agreement, which is what they reverted to when the negotiations fell apart. So that under this contract language, unless the parties had, in fact, agreed to a new letter of credit arrangement under the original license agreement, there was no security arrangement under the original license agreement. The key legal findings that the district court made, the estoppel and implied in fact contract findings, were they predicated upon the way in which the district court interpreted 13.7? Absolutely. The district court found two primary reasons why it didn't believe Golden could, in good faith, have interpreted the contract in the way it did. It said, one, that under this language, Golden must have, couldn't believe that it had no obligation to provide security going forward. That that wasn't a possibility. And the second one was that under this language, it was Golden's obligation to go to Warner when it extended the contract term and say, all right, let's talk about security. We would submit that neither of those is correct with regard to the contract language. In other words, it is entirely possible and it's clear from the record and the district court recognized Golden Channels didn't want to provide security from day one. There was a lot of discussion of that when they entered into the agreement. And the compromise was they'd only provide it for the first two and a half years and then decide what to do after that. They'd discuss in good faith what to do after that. But there's nothing in here that says that required any form of security. Well, what was wrong with the way the district court read this? I mean, if you read it all together, the first sentence, which requires a letter of credit, followed by the next sentence, why couldn't the district court reasonably interpret the way she did? Well, the second sentence is, of course. I mean, as Judge Kleinfeld pointed out, I mean, this was a substantial contract. Right. With parties that are fairly, you know, substantial distance apart. And they wanted some assurance that the bills were going to get paid. Well, there's no question that that's what Warner wanted. But the question is whether this language, which the district court itself found was not an agreement to agree. It was an agreement to negotiate or discuss in good faith. It was not an agreement ever to necessarily agree what, if any, security would be provided. The district court, in reading this, consistently put the word the before appropriate security. But there's no word the there. It is appropriate security, which may, in fact, be no security, if the parties don't discuss and come to a new agreement on security. She rejected, the district court rejected Warner's interpretation of this language, which was the $5 million letter of credit stays in place after May 31st unless the parties agree otherwise. Although there was testimony to that effect, the court found it non-credible from Baxter. Mr. Baxter. Why isn't it an estoppel of the standing with your arms folded while the other party performs type when Golden Channels lose the security there and keeps getting the programming? Your Honor, the parties, as the record shows here, at the time this happened were trying to negotiate a new agreement or an amended agreement. They were trying to come to new terms on an agreement. And they both thought throughout much of this process that that's what they were heading towards. And that is the interpretation that Golden Channels put on what was happening, which is we're going to agree that we're going to leave the letter of credit will remain in place because we're negotiating to a new agreement. And it is clear that Warner wants security under this new agreement. And that's going to be part of our negotiations. But none of this, in Golden's mind, was a discussion about what the obligations were under this contract provision in the original license agreement, which the parties only determined that they were reverting to when the negotiations fell apart. Is it correct that if paragraph 13.7 is ambiguous rather than unambiguous your way, then it goes to trial? And then the clearly erroneous stand, I can't remember right now whether it's jury or bench, but if it goes to trial, it seems like it could go either way. So you have to prevail on showing that paragraph 13.7 is unambiguous. Have I got that right? Well, partly. And I guess partly I would disagree. It is true that if there's parole evidence that can be used to suggest more than one reasonable meaning for the contract language, then the trier of fact, which in this case was the district court, can look at the evidence and try to use that evidence to determine which of the meanings is the proper meaning for this language. But as I say, the district court, insofar as it looked at the evidence and said it all out, and we don't we're not disputing anything that the district court said happened here as to what the parties' communications were. We only dispute the conclusions that the district court came to based on that evidence. The district, even assuming that it's possible that this language could mean that the parties, for instance, had agreed that there would be some form of security, the evidence didn't bear that out. And it certainly didn't bear out for purposes of anticipatory repudiation, which was the basis of the future damages, that Golden Channels couldn't have reasonably believed its interpretation. Let's say for the moment that the deal in 13.7 is the $5 million letter of credit stays in place until May 2002 only. After that, there is no deal to keep the letter of credit there. And let's say, for purposes of my hypothetical question, that the second sentence really doesn't obligate anyone to anything one way or the other regarding the letter of credit. So there's no deal at all to leave the letter of credit in place after 2002. Let's assume all that. Why wouldn't there still be an estoppel? Because they're taking programming and not paying for it after 2002 and leaving the letter of credit in place, which is giving Warner Brothers the kind of assurance of getting paid that most sellers would need in order to keep supplying. Well, I guess I want to correct the statement that there wasn't a continuing commercial relationship such that Golden Channels was paying money for programming. That was going on. It was going on at reduced rate under the terms that the parties thought they were heading towards in their new agreement. So it wasn't simply that Warner Brothers was getting stiffed and was turning over programs. The parties were operating under a different program, as it were. So it's not that Warner was simply turning over programming. And, in fact, the extension of the letter of credit gave them a longer period of time when they, in fact, had credit, even though they weren't entitled to it, as we would maintain under your hypothetical. They had the letter of credit extended, as I explained, at least in Golden's mind, because this was a showing of good faith during renegotiations, but not an intended security for the original license agreement. I think Golden, at any point, could have pulled the letter of credit, couldn't it? Couldn't it tell its bank, letter of credit's over? And then Warner Brothers would have been forced to a decision. That's correct. And they didn't do that until negotiations completely fell apart and they were back under the original agreement that had paragraph 13.7 in it. Your time is starting to run out, and I'd like you to address the damages issue. Okay. Now, you're talking about anticipatory breach and future damages. Yeah, I would like to do that quickly because I was going to focus more on that. But I will, as the district court found because of that, to pay for future license fees on programming, Golden Channels will never obtain or exhibit. It recognized the postal instant press versus Sealy doctrine, which is basically the licensure by terminating causes the lack of future fees, and instead found anticipatory repudiation as a way around that. Now, it's a very high burden under California to prove anticipatory repudiation. And the California Supreme Court has said that, and it characterizes a clear positive and unequivocal refusal to perform. And if you look at much of the case law, you find that the appellate courts finding that there was, in California, finding that there was not an anticipatory repudiation. For instance, in many of the cases, for instance, in the Salote versus Warshaw case, which has facts quite similar to ours, where the defendant stated, quote, that it could not pay the note, the real estate note, when it was due and would not pay it. But it was, the court of appeal found there was no anticipatory repudiation, reversed the trial court because the defendant showed he was, quote, anxious to make some arrangement for an extension. What the court said was there was not evidence there of an unequivocal and absolute refusal to perform. So the district court here relied upon Golden Channels' insistence that it wanted the letter of credit back as its unequivocal and absolute refusal to perform. But that simply wasn't the case under a reasonable interpretation of this, for instance, 13.7. Roberts. Didn't the district court, the problem with that argument, didn't the district court find that they didn't, that Golden did not have a good faith belief in its interpretation? The district court said that, and. Well, that's a finding, isn't it? It is a finding. So what do we do with that? The district court said that, but it's based upon absolutely undisputed communications. In other words, the district court didn't make, that's not a credibility determination. It's based upon the history of the communications between these parties, and it's based largely upon the district court's reading of paragraph 13.7. If you look at it, those are the two, first two, and fundamental reasons why the district court thought Golden Channels couldn't have a good faith belief in its position, because it thought you could not possibly read paragraph 13.7 as saying Golden had no obligation after May 31st, 2002, to post security. And it said Golden couldn't possibly read this provision to say it wasn't Golden's duty to go talk to Warner after May 31st, 2002, and say, hey, what about that letter of credit? Which makes no sense at all. Warner was the party that wanted the letter of credit. As a matter of commercial reality, it's Warner that would have broached the subject. But as I said, Golden's understanding was that the only subject of discussion with regard to the letter of credit going forward after that point was with regard to a new renegotiated agreement, which never happened. And when the parties reverted to their original agreement, Golden's reasonable position was, we're back to the original agreement and we've never agreed to any security under that agreement. Not that we're not going to provide any, but it's not the $5 million letter of credit which we have the right to insist upon. I'm missing a step here. Usually in contract law, if there's a breach, the promisee gets the expectancy less reasonable mitigation. I promise to sell you 100 bushels of wheat at $2 a bushel. You promise to buy them from me. We're cool for 10 bushels, and then you quit buying my wheat. For those other 90 bushels, I do indeed get paid for them less what I can get from somebody else on the market. So if I can only sell them for $1 a bushel instead of the $2 in our deal, I get 90 times the $1 difference. And it looked to me like that's what Warner Brothers got here. And I thought this repudiation and no expectancy doctrine was just an exceptional doctrine that applied, for example, in that franchisor case, not the usual contractual damages. No, it's not an exceptional doctrine, Your Honors. And even the district court interpreted the law in this fashion. It said Sealy is the rule with regard to license agreements. It did not turn on the fact that it was a franchise agreement. There's additional discussion in the case dealing with the franchise aspect of it. But because it's a license agreement, when the licensor terminates based on a breach of the licensee for past termination, failure to pay amounts due, it's the licensor's termination that legally causes the inability to collect future damages. So you don't avoid expectancy, less mitigation, and licensing agreements? Without anticipatory repudiation, at least, no, you don't, which is why the district court determined that it needed to find whether there was anticipatory repudiation here. And, frankly, pulled that doctrine up. So if we were to agree with the district court that the district court's interpretation of clause 13.7 was correct, does that undermine your argument here on the damages issue? Well, certainly. But you couldn't do that, right? Well, we had other reasons why the record showed that Golden Channels did everything it could at the time it received notice of termination to convince, to assure Warner Brothers that it did not want to end this relationship, this commercial relationship that it had. It offered to pay everything that was owed. It sent in an $83,000 check. It offered to escrow the funds if it got that letter of credit back. There's lots of evidence in this record, and I'm just talking about the district court's findings now, that demonstrated that there was a great desire by Golden to proceed under this relationship. It did not want to repudiate this contract. But that evidence is independent of the meaning of the contract terms, but certainly the interpretation of the contract terms is important to the analysis. Unless the Court has any other questions, I have a touch of time left. Thank you. Thank you, counsel. Thank you. May it please the Court, my name is Frederick Cohen. I represent Warner Brothers International Television Distribution, and I want to apologize in advance for the quality of my voice, which is due to a bout of bronchitis that I've just recently overcome, but not entirely. Sorry about that. While you've still got some voice, could you help me on this Seeley and Swinerton problem? I'm really confused by it. Yes. Seeley and the Seeley or Swinerton case deals exclusively with a situation where the only conduct by the breaching party is failure to pay a license fee. There is no repudiation of any other obligations under the contract. In cases where there is a repudiation of other obligations under a contract, the courts find there is a total breach. And in those circumstances, the measure of damages Your Honor alluded to, which is the benefit of the bargain damages, is the normal measure that is accorded to the non-breaching party. I might point out this Court's own decision in Pacific Coast Engineering is an example of a case where the breaching party imposed an intramuscular condition on its performance. It didn't totally refuse to perform. It just insisted on more money as a condition to performing. This Court found, applying California law, that that was a total breach. It was a refusal to perform, and it entitled the non-breaching party to the full benefit of its bargain, which is precisely the appropriate measure of damages in this case. Because for any number of reasons, Golden conditioned its performance on a demand that it was not entitled to make, namely that the letter of credit be returned. Why wasn't it a good faith position? I read that pair of sentences in 13.7 to say Warner gets a letter of credit only until 2002. After that, it will be discussed. It says more than that, Your Honor. The paragraph says that after that 30-month period expires, if Warner exercises this option, Golden agrees to discuss with Warner appropriate security to be given in respect to license fees for the next 30-month period. But why isn't it a fair inference from that second sentence and the word only in the first sentence that what they mean by appropriate security is something other than the letter of credit? If the parties agree that something other than the letter of credit can be given, fine. But the point, Your Honor, is that the letter of credit will stay in effect until they agree on something else, though. It says the letter of credit will stay in place only until 2002. Two points, Your Honor. First, to be given indicates a clear understanding by the parties that something will be given. To the extent the contract is ambiguous, there was extrinsic evidence what the contract meant. At the time the contract was initially negotiated, the principal Warner negotiator, Baxter, made clear to Golden during those negotiations that Warner would not even enter into a contract of this financial magnitude, far greater than anything Golden had ever undertaken in the past, unless Golden's obligations were secure. But it's Warner that extended the deal, right? It's Warner, well, extended the deal? I'm not sure I understand, Your Honor. Well, it was the licensor intends to exercise the extension option. Oh, yes. I'm sorry. So Warner could have said, look, before we exercise our option to extend, we need you to agree that the letter of credit stays there, or the letter of credit gets increased, or whatever it is that they need as a condition of extending. Warner extended the contract long before the parties had to enter into those negotiations. It was about a year out that it extended the contract, and the letter of credit extended for a year. Well, it's up to Warner. But let me just add one other point about the extrinsic evidence, because I think it's important. We're dealing with a trial court's findings of fact about an arguably ambiguous clause, so the extrinsic evidence is important. During the initial negotiations, Golden's negotiated for this term because it said, if we have a, quote, good paying history, that's Baxter quoting Golden, and if, quote, everything's working well, close quote, language that's quoted in our brief, then we'd like to discuss some alternative form of security. Obviously, they did not have a good paying history, and everything was not working well. What happened was, after Warner extended the life of the contract, excuse me, I'm taking my hot water treatment. I think you'll appreciate that. Golden went into a serious default. It defaulted on $1.3 million in quarterly payments. This was after Warner extended the contract. There had been a minor breach prior to that, but Warner had no idea that Golden was in such serious financial straits. At that point, the very negotiation that paragraph 13.7 anticipated would occur did occur. What happened was, Golden said, let's talk about extending, pardon me, let's talk about modifying the contract. Let's talk about lower payment terms so we can actually meet our financial obligations. And Warner's principal negotiator, who again was Baxter, testified. Wait, wait. I'm getting away from where I understand. As I understand it, in order to get your expectancy future damages, it has to be a repudiation of an obligation. And the obligation repudiated is to keep the $5 million letter of credit in effect. Yes. I'm having trouble following that because it doesn't look like they made a deal to keep the $5 million. Here's the deal, Your Honor. Here's where the deal was made. When Golden defaulted on its quarterly payment, you know, $1.3 million, Golden approached Warner and said, let's talk about alternative payment terms. And Warner said, before we agree to do that, and in order to convince us not to declare an immediate default, we want you to agree to something in advance of the negotiations. But they didn't. Yes. Any seller always has a dilemma. On the one hand, I can really sell a lot of volume for a good price. On the other hand, I might not get paid. On the other hand, if I'm too tough, I could get security. On the other hand, if I'm too tough about security, I could lose the deal. It's always a dilemma. And Warner went forward without a deal. Warner went forward with the negotiations with a deal. Warner conditioned its willingness to talk rather than declare a default on an express condition that, and this is according to Baxter, that Golden maintained, quote, maintained the letter of credit in place throughout the extension option terms and any additional terms. Well, that's the language of the district court. Excuse me. What Baxter said was that Warner would only agree to discuss alternative terms if Golden first agreed to keep the letter in place for the full term of the contract. I know that's what Warner said, but I couldn't see where Golden ever said, okay, we agree to keep it in place for the full term. That is where the Staple and implied contract doctrines come into play. This is what the trial court found. It found, A, that Baxter made that statement. It found that Golden was aware he had made that statement, that we won't even talk to you unless you agree that the letter of credit that's in place will remain in place for the full contract term. We can't risk talking to you rather than declaring a default unless we have that assurance. He found, District Court, she found Golden was aware of that, that it participated in negotiations for 14 months without raising objections to those terms, which, according to the district court, led Warner to believe those terms had been accepted. It did more than that, Your Honor. It renewed the letter of credit after the 30-month period expired, which the district court found also misled Warner into believing that the conditions laid down pre-conditions for the negotiations had been accepted. It found Warner was unaware that Golden would change his mind, and finally it found that Warner was prejudiced by being ignorant of the fact that after assuming the court How could they be ignorant? I've seen this happen in construction litigation where everything goes by so fast they just can't think of all the paperwork, that this was going on for a really long time. It has to have been obvious to Warner, we don't have a deal. It has to have been obvious to Golden, we have not said, we're not going to keep the letter of credit in place, and in fact we have put the letter of credit in place. It's kind of analogous to the battle of the forms where What was obvious, what was apparent to, what Warner understood, and what the district court found Warner understood is not that a deal would necessarily be made, but that if a deal wasn't made, the letter of credit would remain in place, and Warner would have protection for the remainder of the contract. All Warner had to do was say, look, we told you, unless you agree to keep the letter in place for the full term, we're not going to negotiate. And then they kept negotiating, even though they didn't get an agreement to keep it in effect. Well, they had an implied contract to keep it in place. It seems like both sides were standing by with their arms folded and letting the other side proceed. Well, Your Honor, the court found that an implied contract existed because if an offer simply calls for doing an act, in this case, keeping the letter of credit in place beyond the 30-month term, then that offer can be accepted by performance. The performance was keeping the letter of credit in place past the original 30-month term. Well, I thought all that Golden did was renew it for one year. It renewed it for, until July 2003, long past. That's just one year, though. That's not whatever term we may continue to get programming from Warner for. Yes, but Warner demanded it be returned long before the end of that year. That year would have expired in July 2003. Golden demanded that the letter of credit be returned in December 2002. So under an implied contract theory, the court found that Golden's conduct in extending the letter of credit for a year evidenced its acceptance, its agreement to keep it in effect for at least that long. But under the estoppel theory, which addresses whether or not Warner relied on Golden accepting the terms that Warner had laid down at the start. Of the negotiations. Prior to the start of the negotiations. In October 2001, in a meeting in Tel Aviv, before the parties even began negotiating, Baxter said, we're not going to even negotiate unless we have this understanding. Now, had Warner said, fine, we agree, we wouldn't be dealing with the estoppel doctrines or the implied in fact contract doctrines. This would, of course, be a much simpler case. But it's not a complicated. You mean if Golden said, fine, we agree. If he said, then we'd have an actual. They didn't say, fine, we agree. No. What they did. Warner knew that they didn't. Warner assumed that they agreed to act in accordance with their conduct, which is what the estoppel doctrine. Why would you assume anything? You've got plenty of time to get it in writing. Because Warner was categorical. Baxter was categorical. In order for us to talk, you've got to keep that letter of credit in place. It seems like if you say, I won't do something unless you do something, and then I don't do the something that you made a condition, it's pretty clear to you that I haven't. Golden did the thing that was asked for. It negotiated, and it kept the letter of credit in place. In other words, it was acting fully in accordance with the preconditions that Warner had laid down. And the district court found that under those circumstances, Warner reasonably believed. But Warner didn't just want the letter of credit to be in place during the negotiations. It wanted an agreement that it should stay in place, if I recall correctly. Yeah, even if the negotiations broke down. And that's exactly what the district court found had occurred. That Warner said we want this to go on. But Golden obviously wanted a hammer in negotiations. Warner's saying if you don't do it our way, we'll cut off the programming. And Golden's saying if you don't do it our way, we'll withdraw our letter of credit. So each of them has a hammer. That's how you negotiate. Well, that may be true. But the question whether or not there was an estoppel and the question whether or not there was an implied, in fact, contract are factual questions. Contrary to opposing counsel's suggestion, the district court did make factual findings in this case with respect to each of the elements of the estoppel doctrine and each of the elements of the implied, in fact, contract. The way those doctrines were applied here, are they independent of the way in which the district court interpreted Clause 13.7? They work hand-in-hand. The Court's estoppel and implied, in fact, contract rulings are totally, completely consistent with 13.7, in that the agreements the parties reached are the agreements to be set in place. Suppose we disagreed with the district court on the district court's interpretation of 13.7. It wouldn't matter. Would it make any difference to the implied, in fact, and the estoppel? No, it would not make any difference. Would it make a difference to the damages that were awarded? No, it would not, because the basis for the damages, in the district court's opinion, are its estoppel and implied, in fact, contract findings. Does that turn us somewhat on the district court's finding that Golden's interpretation of the clause was not made in good faith? It's not its interpretation of the clause that the Court found was in bad faith. It was its conclusion that it had not agreed prior to the outset of the negotiations to keep the letter of credit in place for either the duration of the contract under the estoppel theory or at least until July 2003 if you apply the implied contract doctrine. It's not the interpretation of 13.7. But rather the district court's prior conclusions that there was, in fact, either an agreement or an estoppel to deny that Golden had agreed that the letter of credit would remain in place. The usual estoppel, I hire you to mow my lawn. And we're a little ambiguous about the price, but I just stand there with my arms folded while you mow my lawn. And then I say, oh, we never had a deal. You just did that as a courtesy. But here it's not really analogous because Warner's performance doesn't have to come first. Warner can cut off programming any time because it's not getting paid. So I don't really see where the estoppel works when a party can just say, okay, if you're not doing your part, I'm not going to do my part. Well, the doctrine applies if one party is aware of the facts, certain facts, and another party isn't aware of those facts. And the party who's aware intends his conduct to be relied on. Okay. In this case, the fact we're talking about is Golden's secret and undisclosed intention, despite having extended the letter of credit, to demand that it be returned once the negotiations fell apart. That was an undisclosed intention, which had Warner known, had Golden honestly said, no, we don't intend to keep this letter of credit in effect. Had Golden said that at the time they defaulted on $1.3 million in license fee payments, Warner would immediately have terminated the contract. It would not have gauged. So the finding of facts is secret intention? Yes, because the court found that they acted in bad faith. Well, did the court find that they had a secret intention? I don't think the court used those words, but what the court found is that Warner was unaware that Golden intended to demand that the letter of credit be returned. How could you know what Golden intended? Of course, when they finally did it, you know what they intended. But how do you know they did it all along? That's exactly the point. Well, how do we know? No, how do you know? I mean, I mean... In other words, how do we know that at the outset they intended? Yeah. Because their testimony was, we didn't intend to keep this in effect any longer than the negotiating period. That's what they said. If those negotiations had terminated after a month based on their own statements, they presumably would have demanded the letter of credit be returned at that point. So it was always their intention, undisclosed, to – and, in fact, it's their position on appeal, that they had an obligation to keep the letter of credit in place only during the negotiating period. Wait. I missed a link there. We intend to keep the letter of credit in effect during and not beyond negotiations. So either we make a deal or we don't. If we don't make a deal, they quit supplying programming, we quit keeping the letter of credit in effect. The key is, and the reason I call it an undisclosed intention is, they did not say what Your Honor said. They – Warner said we need to be – in order for us not to declare a default, because at that point gold independently couldn't pay, and in order for us to negotiate, which they did – which – what we need is a – an understanding that this will be the security, whether or not we reach agreement. They didn't say understanding, I don't think. I think they did say something like commitment. Well, Warner – Warner said the only basis on which Warner would contemplate renegotiating the deal – this is a quote – would be the circumstance that we would not review the letter of credit and would remain in situ throughout not just the five-year term but any extension thereof. That was before the parties began negotiating. And did Golden say, no, that's not acceptable, we can't agree to that? No. It did what Warner asked it to do. It began negotiating, and it renewed the letter of credit. There's no way that Warner could have known that Golden, in fact, intended the letter of credit to remain in place only as long as the parties were negotiating. For 10 months, every time the parties exchanged contracts that included the letter of credit term, Golden never raised an objection to that term, never suggested this isn't part of the parties' agreement, shouldn't be part of the parties' agreement, and shouldn't be one of the preconditions for the negotiations. It was only some 13, 14 months later that it first raised that issue, when it was $5 million in debt and when Warner was over a barrel. So that's prejudice, and it's sufficient to support the district court's findings of fact on the estoppel and implied contract theories, which alone support the anticipatory breach theories which were addressed at trial, both factually and legally, and which are the basis for the future damages awards. I see my time is up. Give me your time is up, but give me just a second here. I want to try and think about something. Thank you, counsel. Thank you, Your Honors. I will be very brief since I have very little time. I would want to point out right away that the district court very much did rely upon whether Golden had a reasonable interpretation of the contract in its complete analysis, both on estoppel and contract and particularly future damages. I direct the court particularly to page 359 and following of the excerpts of record, where that is the analysis the court conducted there in finding anticipatory repudiation was Golden's supposed bad faith interpretation of this contract. The only other thing I'd point out again is the sequence of discussions is in the findings. They're not disputed, or at least they're not being disputed for purposes of appeal, and Golden did in fact say, hey, we don't have a deal on letter of credit. We want to talk about what the letter of credit means. Warner did not at that point say, hey, game's over. We're not talking. What excerpt are you citing there? Oh, 359. I'm sorry. That's the discussion of anticipatory breach, and it's all a discussion about what the contract terms mean. What specifically are you disputing as to finding a bad faith? I am saying that Golden had a reasonable interpretation of its obligations under paragraph 13.7. But the bad faith the court finds is just an interpretation. Is that right? That is a – that is – that's correct. That's a big part of it. But wasn't – as counsel put it for the other side, bad faith was in not disclosing their intention. Are you saying that's not a finding of the district court? No, I don't believe so. It didn't find that, in fact. All it found was estoppel based on renewal of the letter of credit. But as I say, Golden made it clear during the negotiations that it had not agreed on the provisions for security going forward under the original license agreement. So the court made no finding of unexclosed intentions, to my knowledge. Again, if Warner had thought there was some deal on security under the original license agreement, when Golden said, no, there's not, and it said that clearly a couple of times, Golden did not cease negotiations. It did not terminate the contract. It did not say, you know, let's get this down in writing so we're clear. It didn't do any of those things. It kept on talking until the negotiations fell apart. And finally, in fact, there was no refusal by Golden to provide security under the original license agreement. It just was never subject of discussion. Unless the Court has any further questions, I will submit. I may. Yes. If I got this right, Golden Channel sends Warner a letter November 26th saying, we'll only negotiate if we don't keep the letter of credit in place. And then Warner sends a letter a week or two later saying, we'll only negotiate if you do. And neither of them responds to the other letter and says, we will not negotiate on the terms you proposed in your letter. I'm trying to remember exactly what those letters said. I thought Golden had said, we will pay the amounts due under the original. We understand we're now back under the original agreement. We'll pay the amounts you claim are due, but we insist upon return of our security first. I think that's what Golden said. Let's see. Golden's letter comes before Warner's? I think that's right. Well, there's a notice of termination. Then there's Golden's letter. And then I think there's Warner's letter in response to that one. And then they just continue supplying programming and the letter of credit stays in effect. Oh, I'm sorry. Do I have a wrong time frame? This is after the notice of termination has happened. And then Warner terminates the contract. I thought those were the letters you were talking about. Yeah. Then it ended. Then it was over. Warner stopped providing programming and sued and drew down the letter of credit all on the same day. Thanks.  Warner Brothers v. Golden is submitted. We'll take a ten-minute recess. All rise. We'll start the ten-minute recess in ten minutes. Sorry. Go ahead. No, no.
judges: Noonan, Kleinfeld, Paez